

## *Colemon v. City of Cincinnati*

United States Court of Appeals for the Sixth Circuit

August 9, 2023, Filed

File Name: 23a0364n.06

No. 21-5968

**Reporter**

2023 U.S. App. LEXIS 20967 *; 2023 FED App. 0364N (6th Cir.); 2023 WL 5095804

JEREL COLEMON, as personal representative of William R. Virgil, deceased, Plaintiff-Appellant, v. CITY OF CINCINNATI and STEVE DANIELS, Norwood Police Officer, Defendants-Appellees.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY.

## Core Terms

murder, investigated, summary judgment, prosecuting, exculpatory information, disclose, non-prosecuting, police officer, homicides, exculpatory evidence, district court, involvement, rights, municipal liability, qualified immunity, municipality, exculpatory, violations, scene, team

## Case Summary

### Overview

HOLDINGS: [1]-A non-prosecuting city was properly granted summary judgment on a released prisoner's Brady claim where its police officers had disclosed all the identified exculpatory information, including another individual's confession, to the prosecuting municipality's police officers; [2]-A police officer was entitled to qualified immunity from the Brady claim as his involvement in the joint investigation was minimal, and even if he had an obligation to disclose information collected, the released prisoner failed to point to precedent that could have given the officer

notice that his level of involvement in the investigation was sufficient for Brady to apply.

**Outcome**

Summary judgment affirmed.

**LexisNexis® Headnotes**

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

*HN1*[🔖]  **Standards of Review, De Novo Review**

A district court's grant of summary judgment is reviewed de novo.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Governments > Local Governments > Claims By & Against

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

Civil Rights Law > ... > Immunity From Liability > Local Officials > Knowledge

Civil Rights Law > ... > Immunity From Liability > Local Officials > Direct Causal Links

*HN2*[🔖]  **Local Officials, Customs & Policies**

Although *42 U.S.C.S. § 1983* may be exercised against a municipality, liability attaches only under a narrow set of circumstances, and a municipality may not be held liable solely for employing a tortfeasor. Instead, a plaintiff must show that through its deliberate conduct, the municipality was the moving force behind the injury alleged. For municipal liability under Monell, a plaintiff must establish that the municipality had a policy or custom that caused the violation of his rights. A plaintiff may demonstrate that a city had such a policy or custom in four ways: the plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of

inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Direct Causal Links

Governments > Local Governments > Claims By & Against

*HN3*[⬇] **Local Officials, Direct Causal Links**

Supreme Court and Sixth Circuit precedent holds that a constitutional injury is required to pursue a Monell claim. But it is undecided whether a municipality's liability under *42 U.S.C.S. § 1983* is predicated on first finding that an individual officer or employee is also liable. Municipalities may be held liable under *§ 1983* in certain cases where no individual liability is shown, including when the municipality itself directly caused the violation, or the violation was caused by a combination of government-sponsored conduct not easily traceable to one individual official, where municipal liability is based on the actions of individual government actors other than those who are named as parties. A defendant municipality's liability has been determined by evaluating only a non-party's actions, suggesting that a party's liability is not required, as long as the court finds a constitutional violation occurred.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN4*[⬇] **Procedural Due Process, Scope of Protection**

Under the Brady rule, the prosecution violates due process when it suppresses material evidence that is favorable to the accused. Violations are assessed using a three-part test: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and, in what is sometimes called the materiality prong, prejudice must have ensued.

Constitutional Law > ... > Fundamental

Rights > Procedural Due Process > Scope of Protection

Evidence > Burdens of Proof > Allocation

*HN5*[⬇] **Procedural Due Process, Scope of Protection**

Information about other legitimate suspects typically favors a defendant and must be disclosed under the Brady rule.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Legal Ethics > Prosecutorial Conduct

*HN6*[⬇] **Procedural Due Process, Scope of Protection**

Police investigating a case generally do have Brady-derived duties to disclose exculpatory information. Although the Brady rule imposes an absolute disclosure obligation only on prosecutors, the police bear an equally important -derived responsibility to turn over potentially exculpatory evidence to the prosecutor's office. When the exculpatory value of evidence is apparent to police, the police have a constitutional duty to preserve and ultimately disclose that evidence. Unlike the prosecutor, who must disclose exculpatory evidence directly to the defendant, police officers typically discharge their Brady duty by disclosing exculpatory evidence to the prosecutor in their jurisdiction.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Legal Ethics > Prosecutorial Conduct

*HN7*[⬇] **Procedural Due Process, Scope of Protection**

Brady obligations are generally understood to extend to information possessed by the law enforcement agency investigating the offense, but they also require a prosecutor to learn of any favorable evidence known to the others acting on the government's behalf in the case, indicating that joint investigators may sometimes incur a Brady duty.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of

Protection

Legal Ethics > Prosecutorial Conduct

*HN8*[📥] **Procedural Due Process, Scope of Protection**

Where a prosecuting jurisdiction is in full possession of the exculpatory information possessed by police in the non-prosecuting jurisdiction, that information is subject to the Brady disclosure obligation of the police and the Brady investigation obligation of the prosecutor in the prosecuting jurisdiction. But where a non-prosecuting jurisdiction shields exculpatory information from the prosecuting jurisdiction, the Brady duty extends to require, at the least, that the exculpatory information be disclosed to police in the prosecuting jurisdiction.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Direct Causal Links

Governments > Local Governments > Claims By & Against

*HN9*[📥] **Local Officials, Direct Causal Links**

An underlying constitutional violation is required to sustain a Monell claim.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

Civil Rights Law > Protection of Rights > Immunity From Liability > Federal Officials

*HN10*[📥] **Affirmative Defenses, Immunity**

When an officer raises a qualified immunity defense, the plaintiff must show a genuine issue of material fact as to whether the officer

2023 U.S. App. LEXIS 20967, *1

violated clearly established federal law. There are two steps to a qualified immunity analysis: the court must determine both that the facts alleged show the officer's conduct violated a constitutional right and that the right was clearly established. The appellate court may address either question first. Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.

**Counsel:** For JEREL COLEMON, as personal representative of William Virgil, deceased, Plaintiff - Appellant: Elliot Slosar, Margaret Elizabeth Campbell, Amy Robinson Staples, Loevy & Loevy, Chicago, IL.

For CITY OF CINCINNATI, OH, Defendant - Appellee: Mark Robert Manning, Assistant City Solicitor, City of Cincinnati Law Department, Cincinnati, OH; Scott Matthew Heenan, City of Cincinnati, Cincinnati, OH.

For HOWARD NIEMEIER, Newport Police Officer, Defendant: Jennifer H. Langen, Adams Law, Covington, KY.

For STEVE DANIELS, Norwood Police Officer, Defendant - Appellee: Keith D. Moore I, City of Norwood, Norwood, OH.

**Judges:** Before: GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

**Opinion by:** JANE B. STRANCH

## Opinion

**JANE B. STRANCH, Circuit Judge**. In 2016, a Kentucky court vacated William Virgil's 1988 murder conviction based on new DNA evidence. A grand jury declined to reindict him, and Virgil was released after 28 years in prison. Virgil brought state and federal claims against the police officers who investigated his case and the three cities that employed them: Newport, Kentucky; Norwood, Ohio; and Cincinnati, Ohio. After discovery, **[*2]** the officers and cities moved for summary judgment. The district court partially denied the City of Newport's and the Newport officers' motions for summary judgment, but granted summary judgment to Norwood, Cincinnati, and those cities' officers as to all claims against them. Virgil now appeals the grant of summary judgment as to his *Brady* claim against Norwood police officer Steve Daniels and as to his *Monell* claim against the City of

Cincinnati.[1]

# I. FACTUAL BACKGROUND

On April 13, 1987, the body of 54-year-old Retha Welch, a psychiatric nurse in Cincinnati, Ohio, was found at her apartment in Newport, Kentucky. A post-mortem investigation showed that she had been raped, stabbed twenty-eight times, and she suffered blunt force trauma to the head. Defendant Newport police officers Marc Brandt, Norman Wagner, and Rick Sears led the initial investigation into Welch's murder, which identified 66 pieces of physical evidence from the crime scene that included fingerprints and a partial bloody palm print. Investigators also noted that jewelry had been taken from the apartment and that Welch's pink Cadillac was missing. Welch's car was discovered the next day in Covington, Kentucky.

Welch knew **[*3]** several former prisoners, including Virgil, through a jail ministry program with which she volunteered. After Virgil's January 1987 release from prison, Welch helped him secure housing and stayed in touch, assisting him with tasks like laundry. Welch's ex-boyfriend tentatively identified Virgil as a man that he had seen at Welch's apartment days before her death was discovered, and two of Virgil's past girlfriends implicated him in the crime. One of his past girlfriends, Sue Daniels, told detectives that Virgil had asked her to help him murder Welch in a plot that included stealing her car and other personal property. Daniels's probation officer confirmed to detectives that Daniels had previously approached him about a boyfriend who planned to commit a murder. Another past girlfriend, Betty Kelow, told detectives that Virgil had asked her to help murder Welch because Welch had threatened to tell his parole officer that he had stolen her credit card. Finally, a Newport officer secured a statement from Virgil's one-time cellmate, Joe Womack, that Virgil had confessed to Womack that he murdered Welch.

The Newport police identified additional suspects, including a man named Isaac Grubbs, **[*4]** who used a witness's phone to call Welch twice on April 11, 1987, and later

---

[1] Virgil died during this appeal and Jerel Colemon, Virgil's relative and the representative of his estate, was substituted as his personal representative in the action. This opinion continues to refer to the Appellant as "Virgil."

that day was shot and killed in a police standoff. Two witnesses also reported that on April 11, they saw a man who matched Grubbs's description, but not Virgil's, driving, parking, and wiping down the surfaces of a pink Cadillac.

Simultaneously, Newport police investigated whether Welch's murder might be connected to two other homicides committed between February and April 1987: the murder of Valerie Wilton in Saint Bernard, Ohio, and the murder of Verlene Leon in Norwood, Ohio. Due to St. Bernard's limited resources, Cincinnati police were brought on to assist St. Bernard police with the Wilton murder investigation. Norwood Police Officer Steve Daniels led the Leon investigation.

On April 16, 1987, officers from Norwood, Newport, and St. Bernard met to discuss the three homicides; Cincinnati also acknowledges that its officers attended a meeting with Norwood, Newport, and St. Bernard on April 15, 1987. Notes from the April 16 meeting show that investigators compared details of the murder scenes and listed similarities including vaginal and anal penetration in all three

homicides, bars of soap left in the bathroom [*5] sinks at the scene in the Welch and Leon murders, beer bottles at the scene in the Welch and Wilton murders, and cuts to the throat in the Wilton and Welch homicides. Newport officer Brandt testified that officers discussed whether there might be a common perpetrator of the homicides, a theory that he said he rejected.

After the initial meetings, the investigations proceeded, with Cincinnati police assisting Newport police with operations in Cincinnati. Cincinnati police helped Newport officers obtain and execute a search warrant on Virgil's father's home in Cincinnati. A Cincinnati police officer, Robert Cardone, obtained a search warrant in Cincinnati for Virgil's hair and blood. Cincinnati officers also helped Newport officers locate a potential witness, Virgil's friend Karen Oglesby, in Cincinnati, and Cincinnati officer Cardone interviewed Oglesby with Newport police on April 22, 1987. A St. Bernard police officer, Kevin Condon, also interviewed Oglesby, and Oglesby gave Condon items of women's clothing that Virgil had given her. File notes show that Newport officer Wagner requested to

take the clothes to be identified by Welch's daughter or ex-boyfriend, but at the time of his **[*6]** deposition, Wagner could not remember whether he took the clothes to be identified.

Officer Daniels of the Norwood police also acknowledges attending a meeting with other investigators to compare notes about the three murders. Afterward, Daniels communicated with St. Bernard officer Condon multiple times about the open homicide investigations in St. Bernard and Norwood. This included an April 20 call from Daniels to Condon, in which Daniels "advised that he would not go to the prosecutor's office," because "he couldn't contribute additional probable cause"; and a call from Daniels to Condon on April 23, in which Daniels asked to come to the St. Bernard police department to exchange more information. These calls appear to have been related to St. Bernard's investigation of the Wilton murder.

The St. Bernard police closed the Wilton investigation after a person named Hiram Hyden committed suicide on April 27, leaving a note that confessed to Wilton's murder.

Potentially relevant to the Welch investigation, Hyden had received psychiatric treatment in April 1987, before Welch's death, at the hospital where she worked. Although no one has ever been charged in the Leon homicide, the Leon investigative **[*7]** file identified a person named "Danny Staudt" as a primary suspect based on a lie detector test.

The Kentucky prosecutor eventually secured an indictment against Virgil. At trial, the Commonwealth relied on circumstantial evidence including testimony from Womack that Virgil had confessed to him.[2] The jury found Virgil guilty and sentenced him to 70 years in prison.

In 2015, Virgil was released and granted a new trial after DNA testing indicated his innocence: DNA testing from the victim's vaginal swab excluded Virgil as a contributor, DNA testing showed with reasonable certainty that blood found on Virgil's clothing did not belong to

---

[2] Among others, the Commonwealth identified Cincinnati Officer Mike Phillips as a fact witness at trial. The court records supporting Phillips's designation as a witness were not before the district court or initially submitted on appeal. Virgil has asked us to take judicial notice under *Federal Rule of Evidence 201* of the fact that the Commonwealth identified Phillips as a fact witness. Because this information is not necessary to our analysis, we deny the motion as moot.

Welch, and that hairs recovered at the crime scene were not Virgil's. In 2016, Womack recanted his testimony and revealed that it had been fabricated and coerced by Newport police. A grand jury declined to reindict Virgil in 2017.

In 2016, Virgil sued thirteen officers and the cities of Newport, Norwood, and Cincinnati, alleging multiple constitutional violations and state law tort claims. After discovery, all defendants moved for summary judgment. The district court granted the motions for summary judgment of the individual Cincinnati and Norwood officers, [*8] finding that they had no duty under *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*, to disclose favorable evidence to Virgil, and likewise granted summary judgment to the City of Cincinnati on Virgil's claim under *Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*, reasoning that there was no underlying *Brady* violation by the City's officers.[3] Virgil

voluntarily dismissed his claims against the individual Cincinnati officers at summary judgment. The district court also concluded that Virgil abandoned his *Monell* claim against the City of Norwood because his summary judgment brief did not discuss it; Virgil does not contest this holding on appeal.

## II. ANALYSIS

*HN1*[ ] A district court's grant of summary judgment is reviewed de novo. *Wesley v. Campbell, 779 F.3d 421, 434-35 (6th Cir. 2015)*. Summary judgment is appropriate here if, construing the evidence and reasonable inferences in Virgil's favor, Cincinnati and Officer Daniels are entitled to judgment as a matter of law. *See id.*; *Fed. R. Civ. P. 56(a)*.

Two questions remain in this appeal: (1) whether Officer Daniels violated Virgil's clearly established due process rights under *Brady*; and (2) whether the City of Cincinnati had a "policy or custom" under *Monell* that caused Cincinnati police officers to violate Virgil's due process rights under *Brady*. Both issues require the Court to address whether officers—the Cincinnati police and/or

---

[3] The district court also denied summary judgment to two Newport officers and the City of Newport. After briefing was completed in the Newport officers' parallel appeal of the district court's denial of qualified immunity, Virgil and the Newport defendants reached a settlement and voluntarily dismissed the appeal.

Officer **[*9]** Daniels—violated *Brady* by withholding evidence developed during their investigation into whether Welch's homicide was connected to the Wilton and Leon murders. Because Cincinnati officers and officer Daniels had different levels of involvement in the interjurisdictional investigation, and because Daniels asserts a qualified immunity defense, we separately evaluate Virgil's claims against the City of Cincinnati and Officer Daniels.

## A. The City of Cincinnati

*HN2*[↑] Although *§ 1983* may be exercised against a municipality, "liability attaches only under a narrow set of circumstances[,]" and a municipality may not be held liable solely for employing a tortfeasor. *Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019).* "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Id.* (quoting *Alman v. Reed, 703 F.3d 887, 903 (6th Cir. 2013)*). For municipal liability under *Monell*, Virgil must establish that Cincinnati had a "'policy or custom' that caused the violation of his rights." *Id.* (quoting *Monell,*

*436 U.S. at 694*). A plaintiff may demonstrate that a city had such a policy or custom in four ways: "the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified **[*10]** illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)*). Virgil proceeds with the theory that Cincinnati had a policy of inadequate training on *Brady* obligations.

Although Virgil continues to allege that Cincinnati is liable for violations of his rights by its officers, he has voluntarily dismissed his *Brady* claim against the individual officers themselves. *HN3*[↑] Supreme Court and Sixth Circuit precedent holds that a constitutional *injury* is required to pursue a *Monell* claim. *See City of L. A. v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)* (per curiam); *D'Ambrosio v. Marino, 747 F.3d 378, 391 (6th Cir. 2014)*. But "[i]t is undecided whether a municipality's liability under *§ 1983* is predicated on first finding that an individual

officer or employee is also liable." *Rayfield v. City of Grand Rapids, 768 F. App'x 495, 511 n.12 (6th Cir. 2019)*. As we held in *Winkler v. Madison County*, municipalities "may be held liable under *§ 1983* in certain cases where no individual liability is shown," including when the municipality itself directly caused the violation, or the violation was caused by a combination of government-sponsored conduct not easily traceable to one individual official, "where municipal liability is based on the actions of individual government actors other than **[*11]** those who are named as parties"—a situation that would be functionally similar to Virgil's voluntary dismissal of the individual government actors here. *893 F.3d 877, 899-901 (6th Cir. 2018)* (quoting *Epps v. Lauderdale Cnty., 45 F. App'x 332, 334-35 (6th Cir. 2002)* (Cole, J., concurring)). Our Circuit has previously determined a defendant municipality's *Monell* liability by evaluating only a non-party's actions, suggesting that a party's liability is not required, as long as the court finds a constitutional violation occurred. *Andrews v. Wayne Cnty., 957 F.3d 714, 725 (6th Cir. 2020)*; *see also Garner v. Memphis Police Dep't, 8 F.3d 358, 365 (6th Cir. 1993)*

(rejecting City's argument that because the only defendant officer in the case had been dismissed by the district court, the City should also be dismissed).

But we need not decide whether a municipality's *Monell* liability is always contingent on finding an individual defendant liable for a constitutional violation. As explained below, even assuming that Virgil may proceed with his *§ 1983* claim against the City of Cincinnati without also suing the individual Cincinnati officers, he has not presented facts from which a jury could find that the officers violated his due process rights under *Brady. See D'Ambrosio, 747 F.3d at 391*.

*HN4*[⬆] In *Brady*, the Supreme Court held that the prosecution violates due process when it suppresses material evidence that is favorable to the accused. *373 U.S. at 87*. *Brady* violations are assessed using **[*12]** a three-part test: "The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently"; and, in what is sometimes called the materiality prong,

"prejudice must have ensued." *United States v. Castano, 906 F.3d 458, 466 (6th Cir. 2018)* (quoting *Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)*). Virgil argues that the Cincinnati officers violated *Brady* by failing to disclose the Wilton and Leon investigative files, which he argues included exculpatory evidence. In particular, he points to evidence of other suspects, including Hiram Hyden, and the fact that Virgil was "cleared" as a suspect in the Wilton and Leon murders.

Neither Cincinnati nor Daniels contest the district court's holding that the evidence related to the officers' joint investigation was exculpatory. **HN5**[↑] Information about other "legitimate suspect[s]" typically favors a defendant and must be disclosed under *Brady*. *D'Ambrosio v. Bagley, 527 F.3d 489, 499 (6th Cir. 2008)*. Because the Cincinnati and Norwood officers investigated whether the murders in their jurisdictions were linked with Welch's murder, the district court correctly reasoned that any suspects developed during that period would also be considered suspects in Welch's murder, and the fact that **[\*13]** Virgil was cleared as a suspect in the Wilton

and Leon murders would tend to exculpate him from the Welch murder.

With respect to *Brady*'s second prong, however, the parties dispute whether the Cincinnati officers had a duty to disclose exculpatory information to the Kentucky prosecutor. **HN6**[↑] Police investigating a case generally do have *Brady*-derived duties to disclose exculpatory information. Although *Brady* imposes an absolute disclosure obligation only on prosecutors, "the police bear . . . an equally important '*Brady*-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir. 2009)* (quoting *White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008)* and reasoning that "there is no doubt that the police are just as capable of depriving criminal defendants of a fundamentally fair trial by suppressing exculpatory evidence."). When the exculpatory value of evidence is "apparent" to police, the police have a "constitutional duty to preserve and ultimately disclose that evidence." *Id. at 388*. Unlike the prosecutor, who must disclose exculpatory evidence directly to the defendant, police officers typically discharge their *Brady*

duty by disclosing exculpatory evidence to the prosecutor in their jurisdiction. *Id. at 379-80*.

The interjurisdictional nature of this dispute **[\*14]** raises a question of first impression: whether a *Brady* disclosure obligation extends to investigating officers in a non-prosecuting jurisdiction when they work together with police in the prosecuting jurisdiction. *Brady* **HN7**[⬆] obligations are generally understood to extend to information possessed by "the law enforcement agency investigating the offense," *Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002)*, but they also require a prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case," *Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)*, indicating that joint investigators may sometimes incur a *Brady* duty.

When that duty applies is less clear. Sixth Circuit precedent suggests that *Brady*'s application to an officer from a non-prosecuting jurisdiction depends on the level of the jurisdiction's involvement in the joint investigation. For instance, we concluded in

*Sutton v. Carpenter* that Brady claims cannot be sustained based on evidence possessed by "*uninvolved* government agencies," indicating that agencies that are sufficiently involved in an investigation do have a *Brady* duty. *617 F. App'x 434, 441 (6th Cir. 2015)* (emphasis added). *Sutton* also noted that prosecutors have "sleuthing duties" as to "material information possessed by members of the prosecution team," *id*, which at its core includes **[\*15]** prosecutors and police who perform investigative duties and make strategic decisions about the case's prosecution, *see, e.g., Kyles, 514 U.S at 437-38*. The Supreme Court's clarification in *Kyles* that the prosecution team may include "others acting on the government's behalf" supports the proposition that a *Brady* duty can also apply to another jurisdiction's officers who participate in investigative duties and strategic decision making. *Id. at 437*.

Indeed, as courts increasingly confront cross-jurisdictional investigations, many have analogously held that the relevant inquiry for imputing knowledge of *Brady* material from extra-jurisdictional actors to a prosecutor is the level of involvement between the prosecuting and non-prosecuting jurisdictions. Although

our Circuit has not addressed this question directly, some courts have examined the "extent to which there was a joint investigation with another agency," considering factors including whether one agency acts on another's behalf or under its control and the extent to which the agencies work as a team and share resources. *United States v. Ellison, 527 F. Supp. 3d 161, 166 (D.P.R. 2021)* (quoting *United States v. Ramos-Cartagena, 9 F. Supp. 2d 88, 91 (D.P.R. 1998)*); *see also United States v. Risha, 445 F.3d 298, 304-05 (3d Cir. 2006)* (collecting cases). Other courts have taken a comprehensive, fact-based approach, examining factors including whether there was jurisdictional [*16] overlap regarding the control or direction of an investigation, whether the case was ever considered a joint investigation with another agency, whether the officer in question was under the prosecutor's authority or control, and whether the officer participated in developing a case for trial. *See Stano v. Butterworth, 51 F.3d 942, 946 (11th Cir. 1995)*; *see also United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979)*.

The district court concluded that our decision in *Rimmer v. Holder, 700 F.3d 246 (6th Cir. 2012)*, precluded the application of a *Brady* duty to a non-prosecuting jurisdiction. In *Rimmer*, the FBI and state law enforcement investigated a defendant's case but only the state prosecuted him. *Id. at 250*. The defendant later filed a *Freedom of Information Act (FOIA)* request for FBI documents, and we determined that the federal government had no *Brady* duty because it had not prosecuted Rimmer, and because he had failed to provide evidence "showing that the FBI somehow used its status as a joint investigator to shield exculpatory information from Rimmer." *Id. at 259*. *Rimmer* emphasized that, rather than segregate the exculpatory evidence in its own files, the FBI had "ensur[ed] that [the evidence] would be subject to *Brady* in the event of a state prosecution" by turning it over to state police. *Id.*

*Rimmer* arose out of a FOIA dispute and did not address a freestanding *Brady* claim; instead, it asked whether a public interest [*17] in the revelation of wrongdoing by the government might justify the documents' disclosure. The case therefore does not control on the question of *Brady*'s application to a non-prosecuting jurisdiction. *Rimmer* is persuasive, however, as

to its reasoning that for *Brady* to apply to a government actor from a non-prosecuting jurisdiction, a plaintiff must show that the non-prosecuting jurisdiction's status as a joint investigator was somehow used to shield exculpatory information from the prosecuting jurisdiction. This makes sense. *HN8*[↑] Where a prosecuting jurisdiction is in full possession of the exculpatory information possessed by police in the non-prosecuting jurisdiction, that information is subject to the *Brady* disclosure obligation of the police and the *Brady* investigation obligation of the prosecutor in the prosecuting jurisdiction. But where a *non-prosecuting* jurisdiction shields exculpatory information from the prosecuting jurisdiction, the *Brady* duty extends to require, at the least, that the exculpatory information be disclosed to police in the prosecuting jurisdiction.

Based on *Rimmer*'s indication that *Brady* may require a joint investigator to disclose exculpatory information to the prosecuting jurisdiction, two questions **[*18]** remain: (1) whether Cincinnati police were sufficiently involved in the Welch investigation to make them investigating members of the "prosecution team" to which a *Brady* duty applied; and (2)

whether they discharged that *Brady* duty by disclosing the exculpatory information to the Newport police or prosecutor. We need not address the first question because the Cincinnati officers disclosed to the Newport police all the information to which Virgil points as exculpatory. The record shows that Newport officers Brandt and Wagner had meetings, phone calls, and other communications about the serial killer investigation and Virgil, and it establishes that they knew Wilton's name, Hyden's confession, and the fact that the investigation was closed ("clearing" Virgil as a suspect)—the only evidence from the Wilton investigation to which Virgil specifically points as exculpatory. Even assuming that a *Brady* obligation applied to the Cincinnati officers as joint investigators, they discharged any *Brady* obligation that applied.

*HN9*[↑] An underlying constitutional violation is required to sustain a *Monell* claim. Because a reasonable jury could not find that the Cincinnati officers violated Virgil's due process rights under *Brady*, his *Monell* **[*19]** claim against the City also fails.

## B. Norwood Officer Daniels

*HN10*[↑] Officer Daniels raises a qualified immunity defense, which means that Virgil must show a genuine issue of material fact as to whether Daniels violated clearly established federal law. *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. There are two steps to a qualified immunity analysis: the court must determine both that "the facts alleged show the officer's conduct violated a constitutional right" and that the right was "clearly established." *Saucier v. Katz, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. We may address either question first. *See Pearson, 555 U.S. at 236*. "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Robertson v. Lucas, 753 F.3d 606, 615 (6th Cir. 2014)* (quoting *Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010)*).

Again, a *Brady* violation would require that Daniels was both sufficiently involved to be considered a part of the prosecution team and failed to disclose material exculpatory information gathered in that investigation to the prosecuting jurisdiction. *See Rimmer, 700 F.3d at 259*. Compared with the Cincinnati officers' contributions to Newport's investigation of Virgil, Officer Daniels' involvement in the joint investigation was relatively minimal. Although Daniels attended at least one interjurisdictional meeting in April 1987, and had several subsequent **[*20]** phone calls with St. Bernard police, Virgil fails to point to record evidence that Daniels had contact with the Newport police or prosecutor in any manner after that meeting.

The definition of "involvement" in an investigation is less than clear. Although some courts addressing the question have provided parameters for interjurisdictional *Brady* obligations, those parameters are highly fact-specific and evaluated in the context of imputing knowledge from other non-prosecuting actors to the prosecutor. Virgil has failed to point to precedent that could have given Daniels notice that his level of involvement in the investigation was sufficient for *Brady* to apply. Therefore, even if Daniels had an obligation to disclose information collected in the Leon investigation, that obligation was not clearly established at the

2023 U.S. App. LEXIS 20967, *20

time of the alleged violation.

## III. CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Cincinnati and Officer Daniels.

---

**End of Document**



# *Gray v. Shelby Cnty.*

United States Court of Appeals for the Sixth Circuit

August 15, 2023, Filed

File Name: 23a0378n.06

Nos. 22-5542/22-5543/22-5544

**Reporter**

2023 U.S. App. LEXIS 21581 *; 2023 FED App. 0378N (6th Cir.); 2023 WL 5237373

KESHA GRAY, Plaintiff-Appellee, v. SHELBY COUNTY, TENNESSEE, et al., Defendants, BRETT BARNETT (22-5542); BRET SIMONSEN (22-5543); EUGENIA SUMNER (22-5544), Defendants-Appellants.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE.

*Gray v. Shelby Cty., 2022 U.S. Dist. LEXIS 96617, 2022 WL 1748258 (W.D. Tenn., May 31, 2022)*

## Core Terms

arrest, qualified immunity, seizure, detain, summary judgment, false-arrest, motorists, questions, constitutional right, district court, unreasonable-seizure, excessive-force, domestic, seize, excessive force, public interest, pulled, arms, reasonable officer, cooperation, detention, arrival, investigate, handcuff, cases, scene, gun

## Case Summary

### Overview

HOLDINGS: [1]-An officer was not entitled to qualified immunity in connection with the arrest of a woman suspected to be a victim of domestic violence because the seizure was unreasonable and no officer, knowing what the officer knew, would think he could seize her; [2]-The officer, however, was entitled to qualified immunity as to the woman's

2023 U.S. App. LEXIS 21581, *1

excessive-force claim because he employed an objectively reasonable amount of force to arrest her; [3]-The supervisor who ordered the officer to arrest the woman and the police sergeant who ordered the supervisor to detain the woman, were not entitled to qualified immunity because the officer lacked a constitutional basis to seize or arrest the woman.

## Outcome

District court's denial of qualified immunity affirmed in part and reversed in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Appellate Review > Appealability

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

### *HN1*[🔽] **Appellate Review, Appealability**

While most denials of summary judgment are nonfinal orders which cannot be appealed pursuant to *28 U.S.C.S. § 1291*, it is well established that an order denying qualified immunity is immediately appealable. However, the court of appeals' jurisdiction in reviewing qualified-immunity denials is limited. The court may entertain the officers' arguments only to the extent they challenge the district court's legal determinations and must ignore the defendant's attempts to dispute the facts as read by the district court. That said, the court honors qualified immunity's principles by considering uncontroverted video evidence in the record.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

### *HN2*[🔽] **Immunity From Liability, Defenses**

Qualified immunity shields public officials from undue interference with their duties and from potentially disabling threats of liability. It

is an immunity from suit, not a mere defense to liability. This immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions, protecting all but the plainly incompetent or those who knowingly violate the law.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

> Torts > Public Entity Liability > Immunities > Qualified Immunity

> Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

> Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

## *HN3*[⬇] **Entitlement as Matter of Law, Appropriateness**

A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. With this burden in mind, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. The inquiry may be conducted in any order.

> Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

> Governments > Courts > Judicial Precedent

## *HN4*[⬇] **Immunity From Liability, Defenses**

A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. To determine whether a constitutional right is clearly established, the court must look first to decisions of the Supreme Court, then to decisions of the court of appeals and other courts within the circuit, and finally to decisions of other circuits. This inquiry does not require a case directly on

point, but existing precedent must have placed the statutory or constitutional question beyond debate. In an obvious case, the law can be clearly established even without a body of relevant case law.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN5*[⬇] **Search & Seizure, Scope of Protection**

The *Fourth Amendment* prohibits unreasonable seizures to protect the right of the people to be secure in their persons. *U.S. Const. amend. IV*.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

*HN6*[⬇] **Search & Seizure, Scope of Protection**

When an officer detains an individual for the purpose of requiring him to identify himself,

the officer performs a seizure of his person subject to the requirements of the *Fourth Amendment*. The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person. Brief seizures are seizures all the same.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN7*[⬇] **Search & Seizure, Scope of Protection**

To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against the importance of the governmental interests alleged to justify the intrusion. This balance involves weighing (i) the gravity of the public concerns served by the seizure, (ii) the degree to which the seizure advances the public interest, and (iii) the severity of the interference with individual liberty. To find a seizure reasonable under the Brown test, there must be specific, objective facts indicating that society's legitimate

interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. In the absence of any basis for suspecting the detainee of misconduct, the balance between the public interest and the detainee's right to personal security and privacy tilts in favor of freedom from police interference.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN8*[🔻] **Search & Seizure, Scope of Protection**

Under the first Brown factor, the graver the public concerns underlying seizure, the more likely the seizure is reasonable.

Family Law > Family Protection & Welfare > Cohabitants & Spouses > Abuse, Endangerment & Neglect

*HN9*[🔻] **Cohabitants & Spouses, Abuse, Endangerment & Neglect**

The public's interest against domestic violence revolves around the victim's well-being. Tennessee's domestic abuse statute expressly makes this point in its legislative intent provision, which states: The general assembly intends that the official response to domestic abuse shall stress enforcing the laws to protect the victim and prevent further harm to the victim. *Tenn. Code Ann. § 36-3-618*. In another provision, the statute expressly states: Arrest is the preferred response only with respect to the primary aggressor. *§ 36-3-619(b)*.

Family Law > Family Protection & Welfare > Cohabitants & Spouses > Abuse, Endangerment & Neglect

*HN10*[🔻] **Cohabitants & Spouses, Abuse, Endangerment & Neglect**

Nothing in *Tenn. Code Ann. § 36-3-619(e)* requires a victim to identify herself to an officer nor obliges anyone to help the officer prepare his report. In this instance, the public's interest in law enforcement's ability to file paperwork is too minimal to support seizing a domestic violence victim — especially considering that the duty comes from a statute seeking to protect

such victims.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

*HN11*[🔽]   **Search & Seizure, Scope of Protection**

The third Brown factor suggests that the more severe an interference with individual liberty, the more likely a seizure is unreasonable.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

*HN12*[🔽]   **Search & Seizure, Scope of Protection**

There is no reason to depart from Brown's observation that, in the absence of any basis for suspecting the detainee of misconduct, the balance between the public interest and the

detainee's right to personal security and privacy tilts in favor of freedom from police interference.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

*HN13*[🔽]   **Search & Seizure, Scope of Protection**

No reasonable officer can question the settled principle that he may not approach an individual on the street, demand identification from that person—for which there is no suspicion that she engaged in criminal activity herself—and forcibly detain her even momentarily in order to induce her cooperation. The Supreme Court's decades of precedent are unequivocal, and it is unreasonable not to apply this *Fourth Amendment* protection to those who are in most need of it: innocents known to the police to have information relevant to an investigation, i.e., known witnesses and victims.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

### HN14[ ] Search & Seizure, Scope of Protection

Police need to stop a motorist to ask for help, but that need—i.e., the need to stop—is less likely present where a pedestrian, not a motorist, is involved.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Seizure of Persons

### HN15[ ] Search & Seizure, Scope of Protection

It is true that, even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Torts > Public Entity Liability > Immunities > Qualified Immunity

### HN16[ ] Immunity From Liability, Defenses

Officers may be entitled to qualified immunity in situations where reasonable officers' could conclude that they have probable cause for an arrest based on plausible instructions from a supervisor when viewed objectively in light of their own knowledge of the surrounding facts and circumstances.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of

Protection

Torts > Intentional Torts > False Arrest > Elements

Torts > Public Entity Liability > Excessive Force

## *HN17*[⤓] Law Enforcement Officials, Excessive Force

But false-arrest claims and excessive-force claims are distinct, such that establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa. In other words, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim. When properly stated, an excessive force claim relates to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. Courts must therefore analyze the excessive force claim without regard to whether the arrest itself was justified. The U.S. Court of Appeals for the Sixth Circuit joins its sister circuits and concludes that force is not per se excessive when used to make a false arrest.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Torts > Public Entity Liability > Excessive Force

## *HN18*[⤓] Law Enforcement Officials, Excessive Force

To determine whether force is excessive, courts employ an objective-reasonableness test, asking whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. It is a fact-intensive inquiry, with the overarching determination being whether the totality of the circumstances justified the degree of force an officer used, The court assesses the situation from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of

Protection

## *HN19*[⬇] **Law Enforcement Officials, Excessive Force**

Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the *Fourth Amendment*. The right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. As recognized in Burchett v. Kiefer, the minimal use of force to handcuff someone is not excessive when that individual twists and turns some, keeping one arm out and preventing officers from bringing it down.

> Criminal Law & Procedure > Search & Seizure > Seizure of Persons

> Evidence > Burdens of Proof > Allocation

> Torts > Intentional Torts > False Arrest > Elements

## *HN20*[⬇] **Search & Seizure, Seizure of Persons**

Unreasonable-seizure and false-arrest claims require a plaintiff to prove that the arresting officer lacked a constitutional basis to seize or arrest the plaintiff.

> Civil Rights Law > ... > Immunity From Liability > Local Officials > Direct Causal Links

> Torts > Public Entity Liability > Liability > Vicarious Liability

## *HN21*[⬇] **Local Officials, Direct Causal Links**

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. Supervisors must commit some active unconstitutional behavior to be liable. Active behavior does not mean physically putting hands on the injured party or even physically being present at the time of the constitutional violation. Active behavior can consist of encouraging the specific incident of misconduct or in some other way directly participating in it, or implicitly authorizing, approving, or knowingly acquiescing in the unconstitutional conduct of the offending officers. Such active behavior must be both a cause in fact and a

proximate cause of the alleged injury.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

*HN22*[⬇] **Immunity From Liability, Defenses**

Qualified immunity can protect against claims of supervisory liability. As in ordinary § 1983 cases, to overcome a claim of qualified immunity, a plaintiff must show that the supervisor's own behavior violated her constitutional rights. But the doctrine is modified at the clearly established prong. A plaintiff need only show that the right that the subordinate violated was clearly established at the time of the violation.

**Counsel:** For KESHA GRAY (22-5542, 22-

5544), Plaintiff - Appellee: Brice Moffatt Timmons, Craig A. Edgington, Melissa Jo Stewart, Donati Law, Memphis, TN.

For BRETT BARNETT (22-5542, 22-5543), Defendant - Appellant: Robert D. Meyers, Danielle N. Rassoul, Aubrey B. Greer, Glankler Brown, Memphis, TN.

For KESHA GRAY, Plaintiff - Appellee (22-5543): Brice Moffatt Timmons, Craig A. Edgington, Melissa Jo Stewart, Donati Law, Memphis, TN.

For EUGENIA SUMNER, Defendant - Appellant (22-5544): Robert D. Meyers, Aubrey B. Greer, Danielle N. Rassoul, Glankler Brown, Memphis, TN.

**Judges:** Before: SILER, KETHLEDGE, WHITE, Circuit Judges.

**Opinion by:** HELENE N. WHITE

**Opinion**

**HELENE N. WHITE, Circuit Judge.** Officers Brett Barnett, Bret Simonsen, and Eugenia Sumner appeal the denial of their motions for summary judgment based on qualified immunity in this action brought by

Kesha Gray alleging unreasonable-seizure and false-arrest claims against all three officers and an excessive-force claim against Barnett. We AFFIRM IN PART and REVERSE IN PART.

I.

On March 29, 2020, Defendant Shelby County Deputy Brett Barnett responded to a disturbance call regarding [*2] a male and a female engaged in a domestic dispute on the side of a road. The caller—Christopher Hodge—stated that the male had the female in a chokehold or headlock and was punching her in the face. Hodge added that he tried to intervene, but male threatened him, so he (Hodge) pulled out a gun, leading the male to drive away without the female, leaving her on the side of the road.

Upon arriving at the scene, Barnett spoke with Hodge, who repeated what he had told the 911-operator. Barnett then located Plaintiff Kesha Gray, who matched the description of the female and was walking along the road. Barnett asked Gray what happened, and Gray explained that she and her fiancé had a heated verbal argument. Gray showed Barnett her arms and hands, indicating that she did not have any bruises, scratches, or other signs of a physical altercation. Barnett told Gray that Tennessee law required him to document all domestic-violence incidents and Gray responded that she would provide no identifying information or statement.

Barnett returned to his police vehicle and called his supervisor, Defendant Sergeant Eugenia Sumner. Barnett recounted the differences in the facts as told by Hodge and Gray. [*3] Barnett finished by telling Sumner that Gray said "she didn't call [the police], she's not under arrest, and she has the right not to say anything." R.72-1 Ex. 1 at 5:26 - 7:55. Sumner replied, "That's true, that's true." *Id.* Sumner then asked, "Everybody says she's the victim?" and Barnett answered yes — at least according to Hodge, who was the only witness and who had "pulled a pistol" on Gray's fiancé. *Id.* Sumner directed Barnett to keep an eye on Gray while Sumner called the General Investigations Bureau to figure out what to do.

Sumner called Defendant Sergeant Bret Simonsen and explained the situation. Simonsen advised Sumner "to detain [Gray] for further investigation" and "to identify her."

R.72-2 PID 592. Simonsen stated that Gray had "a duty to help with the investigation." *Id.* Sumner called Barnett back and told him to hold Gray for questioning.

Barnett radioed for backup, explaining that Gray will have an attitude and that he is "probably going to have to fight her to get her information." R.72-1 Ex. 1 at 5:26 - 7:55. Barnett then exited his vehicle, approached Gray, and asked for identification. Gray again refused. Barnett asked, "Do I need to detain you?" and Gray kept [*4] walking away. *Id.* Barnett pulled out his handcuffs, sped up, grabbed Gray's left wrist and attempted to handcuff her. Gray successfully pulled away. Barnett re-engaged her five more times but was unsuccessful in handcuffing her. Barnett then lunged at Gray and wrapped his arms around her. The two grappled for roughly twenty seconds. Gray broke free and continued to walk home with Barnett in tow.

Officers Price and Foster arrived and helped Barnett surround Gray and successfully tackle her to the ground. Gray pleaded with them to stop, telling them that she was pregnant. They handcuffed her, picked her up off the ground,

and placed her in a police vehicle. Sumner arrived later, and, while Gray remained in the police car, the officers began to discuss charges. Gray was charged with assault, disorderly conduct, obstructing a highway or passageway, and resisting official detention. She was held in jail for twelve hours. Gray suffered a miscarriage soon after, and all the charges against her were dropped.

Gray brought this action against Barnett, Sumner, and Simonsen, among others. As relevant to this appeal, Gray asserted unreasonable-seizure and false-arrest claims against the three appellants [*5] and also an excessive-force claim against Barnett. Defendants moved for summary judgment based on qualified immunity. The district court determined that qualified immunity did not shield Barnett, Sumner and Simonsen from the unreasonable-seizure and false-arrest claims, nor Barnett from the excessive-force claim, and denied summary judgment. Defendants timely appealed.

II.

*HN1*[↑] "While most denials of summary judgment are nonfinal orders which cannot be

appealed pursuant to *28 U.S.C. § 1291*, it is well established that an order denying qualified immunity is immediately appealable." *Harrison v. Ash, 539 F.3d 510, 516 (6th Cir. 2008)*. However, this court's jurisdiction in reviewing qualified-immunity denials is limited. *Coffey v. Carroll, 933 F.3d 577, 583-84 (6th Cir. 2019)*. We may "entertain the officers' arguments only to the extent they challenge the district court's legal determinations" and "'must ignore the defendant's attempts to dispute the facts' as read by the district court." *Id.* (quoting *Bunkley v. City of Detroit, 902 F.3d 552, 560 (6th Cir. 2018)*). That said, "we honor qualified immunity's principles by considering" uncontroverted video evidence in the record. *Bell v. City of Southfield, 37 F.4th 362, 364 (6th Cir. 2022)*; *Rudlaff v. Gillispie, 791 F.3d 638, 639 (6th Cir. 2015)* ("Where the police dash-cam videos depict all of the genuinely disputed facts, we view the facts in the light depicted by the videotapes." (cleaned up)).

*HN2*[⬆] Qualified immunity shields public officials **[*6]** "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. It is an "*immunity from suit*," not a "mere defense to liability." *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)* (emphasis in original). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)* (quoting *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*).

*HN3*[⬆] A "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble, 641 F.3d 743, 750 (6th Cir. 2011)*. With this burden in mind, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established."[1] *Williams v. Maurer, 9*

---

[1] Prior to *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*, we "attributed a third prong of 'objective unreasonableness' to the qualified immunity analysis." *Brown v. Lewis, 779 F.3d 401, 417 (6th Cir. 2015)* (citing *Feathers v. Aey,*

*F.4th 416, 430 (6th Cir. 2021)* (quoting *Bishop v. Hackel, 636 F.3d 757, 765 (6th Cir. 2011)*). The inquiry may be conducted in any order. *Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).*

*HN4*[↑] A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)* (cleaned up). "To determine whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions **[*7]** of this Court and other courts within our circuit, and finally to decisions of other circuits." *Cahoo v. SAS Analytics Inc., 912 F.3d 887, 898 (6th Cir. 2019)* (alteration omitted) (quoting *Crawford v. Geiger, 656 F. App'x 190, 198 (6th Cir. 2016)*). This inquiry does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd, 563 U.S. at*

*741* (citations omitted). "[I]n an obvious case," the law can be clearly established "even without a body of relevant case law." *Brosseau v. Haugen, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).*

III.

Barnett argues the district court erred in not recognizing his qualified immunity from Gray's unreasonable-seizure, false-arrest, and excessive-force claims.

A.

Because Gray's Amended Complaint does not assert separate unreasonable-seizure and false-arrest claims, the district court analyzed Barnett's qualified immunity from both together. R.121 PID 1240 n.2 ("Gray's false arrest claim is included within a broader, unreasonable seizure claim."). We do so as well. We undertake the qualified-immunity inquiry in the ordinary sequence, first assessing whether Barnett violated a constitutional right and then assessing whether the right was clearly established.

1.

*HN5*[↑] The *Fourth Amendment* prohibits

---

*319 F.3d 843, 848 (6th Cir. 2003)*). We have since corrected course, observing that "there is no additional, separate hurdle of reasonableness for [a plaintiff] to overcome" and dispensing with the third prong. *Id.* Accordingly, we reject Barnett's argument that we must also find his conduct "objectively unreasonable" in order to deny him qualified immunity. Case No. 22-5542 Appellant Br. at 33-35 (quoting *Feathers, 319 F.3d at 851*).

"unreasonable . . . seizures" to protect "[t]he right of the people to be secure in their persons." *U.S. Const. amend. IV*. Accordingly, **[*8]** we must first determine whether Barnett seized Gray and, if so, whether the seizure was unreasonable.

*HN6*[↑] When an officer detains an individual "for the purpose of requiring him to identify himself," the officer "perform[s] a seizure of his person subject to the requirements of the *Fourth Amendment*." *Brown v. Texas, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)*. "The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid, 141 S. Ct. 989, 994, 209 L. Ed. 2d 190 (2021)*. "[B]rief seizures are seizures all the same." *Id. at 999*. Accordingly, when Barnett grabbed Gray's hands, lunged at her, wrapped his arms around her, and grappled with her for roughly twenty seconds, he seized her, notwithstanding her evading capture. Barnett's "conduct would have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business." *Kaupp v. Texas, 538 U.S. 626, 629, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003)* (quoting *Florida v. Bostick, 501 U.S. 429, 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)*).

*HN7*[↑] "To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against 'the importance of the governmental interests alleged to justify the intrusion.'" *Colson v. City of Alcoa, 37 F.4th 1182, 1186 (6th Cir. 2022)* (quoting *Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*). This balance involves weighing "[i] the gravity of the public concerns served by the seizure, **[*9]** [ii] the degree to which the seizure advances the public interest, and [iii] the severity of the interference with individual liberty." *Brown, 443 U.S. at 50-51*. To find a seizure reasonable under the *Brown* test, there "must be . . . specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* "In the absence of any basis for suspecting [the detainee] of misconduct"—as is the case here—"the balance between the public

interest and [the detainee's] right to personal security and privacy tilts in favor of freedom from police interference." *Id. at 52*.

*HN8*[↑] Under the first *Brown* factor, the graver the public concerns underlying seizure, the more likely the seizure is reasonable. We agree with Barnett that domestic violence is of grave public concern and, as such, this factor favors finding Barnett's seizure reasonable.

The second *Brown* factor, however, strongly weighs against finding Barnett's seizure reasonable. The public's interest against domestic violence revolves around the victim's well-being. *HN9*[↑] Tennessee's domestic abuse **[*10]** statute expressly makes this point in its "legislative intent" provision, which states: "[T]he general assembly intends that the official response to domestic abuse shall stress enforcing the laws to *protect the victim and prevent further harm to the victim . . . .*" *Tenn. Code Ann. § 36-3-618* (emphasis added). In another provision, the statute expressly states: "Arrest is the preferred response only with respect to the primary aggressor." *Id. § 36-3-619(b)*. The law does not suggest that police physically forcing suspected domestic-violence

victims to cooperate advances the cause against domestic violence. That practice inflicts—not prevents—harm.

In evaluating this second factor, we reject Barnett's emphasis on Gray's status as a witness to a crime because a state's "interest in detaining witnesses for information is of relatively low value." *Maxwell v. County of San Diego, 708 F.3d 1075, 1084 (9th Cir. 2013)* (discussing *United States v. Ward, 488 F.2d 162, 169 (9th Cir. 1973)* (en banc)). We also reject Barnett's suggestion that the seizure advanced the public interest because it enabled him to file a "statutorily mandated report" required by *Tennessee Code Annotated § 36-3-619(e)*. Case No. 22-5542 Appellant Br. at 29. That provision reads:

When a law enforcement officer investigates an allegation that domestic abuse occurred, the officer shall make a complete report and file the **[*11]** report with the officer's supervisor in a manner that will permit data on domestic abuse cases to be compiled. If a law enforcement officer decides not to make an arrest or decides to arrest two (2) or more parties, the

officer shall include in the report the grounds for not arresting anyone or for arresting two (2) or more parties.

*Tenn. Code Ann. § 36-3-619(e)*. **HN10**[⬆] Nothing in this statute requires a victim to identify herself to an officer nor obliges anyone to help the officer prepare his report. In this instance, the public's interest in law enforcement's ability to file paperwork is too minimal to support seizing a domesticviolence victim — especially considering that the duty comes from a statute seeking to protect such victims.

**HN11**[⬆] The third *Brown* factor suggests that the more severe an interference with individual liberty, the more likely a seizure is unreasonable. Even assuming Barnett is correct—that, for the unreasonable seizure claim, "the interaction in question consists of the two (2) minutes immediately preceding [Officers] Price and Foster's arrival," Case No. 22-5542 Appellant Br. at 12—his interference was aggressive. In *Illinois v. Lidster*, the Supreme Court concluded that subjecting all motorists to **[*12]** a "systematic[]" and short highway stop was reasonable, in part because it

"provided little reason for anxiety or alarm." *540 U.S. 419, 428, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004)*. A crime victim would, however, have good reason for anxiety and alarm when, despite no one disputing her innocence, the police target her, chase her, attempt to handcuff her, lunge at her, wrap their arms around her, and grapple with her. At best, this factor is neutral.

**HN12**[⬆] We conclude that there is no reason to depart from *Brown*'s observation that, "[i]n the absence of any basis for suspecting [the detainee] of misconduct, the balance between the public interest and [the detainee's] right to personal security and privacy tilts in favor of freedom from police interference." *Brown, 443 U.S. at 52*. Because Barnett's seizure was unreasonable, he violated Gray's constitutional rights. Thus, the first prong of the qualified immunity test is satisfied.

2.

Turning to the clearly-established prong, the present circumstances exemplify an "'obvious case' where general 'standards can clearly establish the answer, even without a body of relevant case law.'" *Colson, 37 F.4th at 1189*

(quoting *Rivas-Villegas v. Cortesluna, \_ U.S. \_, 595 U.S. 1, 142 S. Ct. 4, 8, 211 L. Ed. 2d 164 (2021)* (per curiam)). The Supreme Court's observations have put the question beyond debate. *See al-Kidd, 563 U.S. at 741*.

In 1969, the Supreme Court remarked that it **[*13]** was a "*settled principle* that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes[,] they have no right to compel them to answer." *Davis v. Mississippi, 394 U.S. 721, 727 n.6, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969)* (emphasis added); *id. at 726-27* ("*Nothing is more clear* than that the *Fourth Amendment* was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" (emphasis added)). Ten years later, the *Brown* Court expressly concluded that

> [E]ven assuming that [the public's interest in preventing crime] is served to some degree by stopping and *demanding identification* from an individual without any specific basis for believing he is involved in criminal activity, the guarantees

of the *Fourth Amendment* do not allow it.

*443 U.S. at 52* (emphasis added). Four years after that, in *Florida v. Royer*, the Supreme Court again observed that "law enforcement officers do not violate the *Fourth Amendment* by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen," but the person questioned "may not be detained *even momentarily* without reasonable, objective **[*14]** grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)* (plurality opinion) (emphasis added); *see also Bostick, 501 U.S. at 437* ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)* (reiterating the observations made in *Royer* and *Bostick*). In 2002, the Supreme Court noted that law enforcement "may pose questions" to and "*ask for identification*" from an individual without a "basis for suspecting

[that] particular individual" of criminal conduct "provided [that] they do not induce cooperation by coercive means." *United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)* (emphasis added).

*HN13*[⬆] Put together: No reasonable officer can question the "settled principle" that he may not "approach an individual on the street," "demand[] identification" from that person—for which there is no suspicion that she engaged in criminal activity herself—and forcibly detain her "even momentarily" in order to "induce [her] cooperation." The Supreme Court's decades of precedent are unequivocal, and it is unreasonable not to apply this *Fourth Amendment* protection to those who are in most need of it: innocents known to the police to have information **[*15]** relevant to an investigation, *i.e.*, known witnesses and victims. It is beyond debate that the *Fourth Amendment* prohibits Barnett's actions. *See Davis v. Dawson, 33 F.4th 993, 1005 (8th Cir. 2022)* (Stras, J., concurring) ("We once again reject the argument that investigatory need justifies suspicionless seizures. No *Fourth Amendment* principle is more clearly established."); *see also* R.72-1 Ex. 1 at 7:31 -

7:40 (Barnett recounting that Gray said "she didn't call [the police], she's not under arrest, and she has the right not to say anything," and Sumner responding, "That's true, that's true").

We also reject the argument that *Illinois v. Lidster, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004)*, would lead a reasonable officer to doubt the unconstitutionality of the conduct here. In *Lidster*, the Supreme Court considered highway-checkpoint stops during which the police asked motorists for information about a fatal hit-and-run. *Id. at 421*; *id. at 423* ("The stop's primary law enforcement purpose was . . . to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others."). The Court recognized that police have a right to "solicit[] the public's assistance" in investigating a crime. *Id. at 425-26*. It also recognized a practical difference between soliciting that help from motorists and from pedestrians. **[*16]** *Id. HN14*[⬆] Police "need to stop a motorist" to ask for help, but that "need"—*i.e.*, the need to stop—is "less likely present where a pedestrian, not a motorist, is involved." *Id. at 425*. To avoid the "anomalous"

result where police could "freely [] seek the voluntary cooperation of pedestrians" but not "seek similar voluntary cooperation from motorists," the Court held that such highwaycheckpoint stops are constitutional. *Id. at 426*. *Lidster* says that police may stop *motorists* in order to solicit their assistance; it does not say anything with respect to what police can or cannot do to pedestrians. *See* Kit Kinports, Camreta *and* al-Kidd: *The Supreme Court, the Fourth Amendment, and Witnesses*, *102 J. Crim. L. & Criminology 283, 305-06 (2012)* ("But the practical reality constraining both the police and the Court in *Lidster*—that the only way to 'approach[]' drivers and ask if they are 'willing to answer some questions' is to 'seize' them—applies only in cases where witnesses are on the road." (quoting *Lidster, 540 U.S. at 425*)). Additionally, *Lidster* is factually inapposite in that police "simply" requested information and distributed a flyer. *540 U.S. at 428*. There is no suggestion that police further detained motorists who declined to give information. *See id.* ("And there is no allegation here that the police acted in a[n] . . . unlawful **[*17]** manner while questioning motorists during stops.").

*HN15*[↑] It is true that we have previously recognized that "even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz, 641 F.3d at 755*. But that is not what happened here, and that is not the reason Barnett cites for his detention of Gray. No reasonable officer in Barnett's shoes would believe he needed to detain Gray to secure the scene of a valid search or arrest or to ensure the safety of officers or others. When Barnett sought to detain Gray, the area was not the scene of a valid search or arrest. No person's safety was in jeopardy either, notwithstanding a confrontation with a gun, because a reasonable officer would know—as Barnett did—that Hodge possessed the gun and that he was giving his information to other officers. Nor was Gray's safety reasonably in question, considering her abuser had fled — and especially considering that Gray emphasized that the altercation was entirely verbal and showed that she had no indicia of physical injury.

We also reject any argument that Barnett is

entitled to qualified **[*18]** immunity because he was simply following Sumner's orders. *HN16*[↑] In *Bunkley v. City of Detroit*, we observed that officers may be entitled to qualified immunity in situations where "'reasonable officers' could conclude that they have probable cause for an arrest based on 'plausible instructions' from a supervisor when 'viewed objectively' in light of their own knowledge of the surrounding facts and circumstances." *902 F.3d 552, 562 (6th Cir. 2018)* (quoting *Anthony v. City of New York, 339 F.3d 129, 138 (2d Cir. 2003)*). Sumner's instructions are not enough; reasonable officers must consider the known facts and circumstances. No officer, knowing what Barnett knew, would think he could seize Gray.[2]

Accordingly, we affirm the denial of Barnett's motion for qualified immunity as to Gray's unreasonable-seizure and false-arrest claims.

B.

In contrast, Barnett's motion for summary judgment on Gray's excessive-force claim based on qualified immunity should have been granted. To reach this conclusion we need only analyze whether Barnett's actions violated Gray's constitutional rights. Our analysis is factually confined to the events preceding the arrival of Barnett's backup. *See* R.121 PID 1251-52 (distinguishing between the "First Incident" and the "Second Incident").

As a preliminary matter, we identify a flaw in the theory **[*19]** behind Gray's excessive-force claim. Gray argues on appeal that because Barnett had no individualized suspicion that Gray had engaged or would be engaging in criminal conduct, he "was therefore not justified in using *any* force against her." Case No. 22-5542 Appellee Br. at 23 (emphasis in original). Essentially, Gray contends that any force used to falsely arrest is per se excessive. *HN17*[↑] But false-arrest claims and excessive-force claims are "distinct, [such that] establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston, 354 F.3d 1058, 1064 (9th Cir. 2004)*. In other words, "a claim that any force in an illegal stop or arrest is excessive is subsumed in

---

[2] In his declaration, Barnett avers that he "believed that [his] superiors had more information or knowledge than [he] did regarding the situation." R.88-1 PID 762. On Gray's facts, that belief was unreasonable.

2023 U.S. App. LEXIS 21581, *19

the illegal stop or arrest claim and is not a discrete excessive force claim." *Bashir v. Rockdale County, 445 F.3d 1323, 1331 (11th Cir. 2006)* (quoting *Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000)*). "When properly stated, an excessive force claim . . . relat[es] to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." *Id. at 1332*; *see also Gerling v. City of Hermann, 2 F.4th 737, 743-44 (8th Cir. 2021)*. Courts "must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007)* (citing *Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007)* (en banc) ("[I]n a case where police effect an arrest without probable cause . . . but use no more force **[*20]** than would have been reasonably necessary if the arrest or detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.")). We join our sister circuits and conclude that force is not per se excessive when used to make a false arrest. *E.g.,* *Sebright v. City of Rockford, 585 F. App'x 905, 907 (7th Cir. 2014)* (citing, among other cases, *Snell v. City of York, 564 F.3d 659, 672-73 (3d Cir. 2009)*, and *Jones v. Parmley, 465 F.3d 46, 61-62 (2d Cir. 2006)*); *Velazquez v. City of Long Beach, 793 F.3d 1010, 1024 n.13 (9th Cir. 2015)*.

*HN18*[ ] To determine whether force is excessive, courts "employ an objective-reasonableness test, asking 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Estate of Hill v. Miracle, 853 F.3d 306, 312 (6th Cir. 2017)* (quoting *Graham, 490 U.S. at 397*). It is a "fact-intensive inquiry," *Jones v. City of Elyria, 947 F.3d 905, 916-17 (6th Cir. 2020)*, with the "overarching determination" being "whether the 'totality of the circumstances' justified the degree of force an officer used," *Shanaberg v. Licking County, 936 F.3d 453, 456 (6th Cir. 2019)* (quoting *Bletz, 641 F.3d at 751*). We assess the situation from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville, 781 F.3d 314, 321 (6th Cir. 2015)* (quoting *Graham, 490 U.S. at 396*).

Barnett employed an objectively reasonable amount of force to arrest Gray. The uncontroverted video evidence shows Barnett grabbing or attempting to grab Gray's hands six times. With minimal effort, Gray successfully shrugs Barnett off [*21] each time. Barnett also lunges at Gray, wraps his arms around her, and tries to pin Gray's left arm to her back and handcuff her. But, after about 20 seconds, Gray escaped Barnett's hold by spinning away from him. Barnett used more force in this latter part of the interaction than he did prior, but we cannot conclude it was an objectively unreasonable amount of force. *HN19*[⬆] "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the *Fourth Amendment*." *Saucier v. Katz, 533 U.S. 194, 209, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)* (quoting *Graham, 490 U.S. at 396*). "The right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Shreve v. Jessamine Cnty. Fiscal Ct., 453 F.3d 681, 687 (6th Cir. 2006)* (cleaned up) (quoting *Graham, 490 U.S. at 396*). As recognized in *Burchett v. Kiefer*, the minimal use of force to handcuff someone is not

excessive when that individual "twist[s] and turn[s] some," "ke[eping] one arm out" and preventing officers from "bring[ing] it down." *310 F.3d 937, 940, 944 (6th Cir. 2002)*.

Gray does not cite any cases suggesting Barnett's actions were objectively unreasonable, instead reiterating her flawed legal theory. The district court relied on *Smith v. City of Troy, 874 F.3d 938 (6th Cir. 2017)*, to conclude that "Barnett's use of force was excessive," R.121 PID 1251 (citing *Smith, 874 F.3d at 945*). Although this case and *Smith* involve the "forcible handcuffing" [*22] of an individual who committed no crime and presented no safety risk, there is a key difference. *874 F.3d at 944-45*. In *Smith*, the officer "violated Smith's right to be free from excessive force when he took Smith to the ground with a leg sweep and landed on top of Smith." *Id.* Barnett did not employ a comparable amount of force; Gray was not taken to the ground during her encounter with Barnett prior to his backup arriving.

Because Barnett used an objectively reasonable amount of force, he did not violate Gray's constitutional rights and is entitled to qualified

immunity from Gray's excessive-force claim.

## IV.

Gray asserts unreasonable-seizure and false-arrest claims against Sumner for ordering Barnett to detain Gray, and against Simonsen for directing Sumner to order Barnett to detain Gray. *HN20*[⬆] Such claims require a plaintiff to prove that "the arresting officer" lacked a constitutional basis to seize or arrest the plaintiff. *Voyticky v. Vill. of Timberlake, 412 F.3d 669, 677 (6th Cir. 2005)*.

*HN21*[⬆] "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Supervisors must commit "some 'active unconstitutional behavior'" to be liable. *Peatross v. City of Memphis, 818 F.3d 233, 241 (6th Cir. 2016)*. "Active behavior" does not mean "physically put[ting] hands on the **[*23]** injured party or even physically being present at the time of the constitutional violation." *Id. at 242* (alterations omitted). Active behavior can consist of "encourag[ing] the specific incident of misconduct or in some other way

directly participat[ing] in it," *Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984)*, or "implicitly authoriz[ing], approv[ing], or knowingly acquiesc[ing] in the unconstitutional conduct of the offending officers," *Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)* (quoting *Hays v. Jefferson County, 668 F.2d 869, 874 (6th Cir. 1982)*); *Crawford v. Tilley, 15 F.4th 752, 761 (6th Cir. 2021)*. Such active behavior "must be both a cause in fact and a proximate cause of the alleged injury." *Crawford, 15 F.4th at 762*.

*HN22*[⬆] Qualified immunity can protect against claims of supervisory liability. As in ordinary § 1983 cases, to overcome a claim of qualified immunity, a plaintiff must show that the supervisor's own behavior violated her constitutional rights. But the doctrine is modified at the clearly established prong. A plaintiff "need only show that the right that [the subordinate] violated was clearly established at the time of the violation." *Peatross, 818 F.3d at 245* (first quoting *Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999)*, and then citing *Coley v. Lucas County, 799 F.3d 530, 539-41 (6th Cir. 2015)*).

Gray contends that Sumner knew that Hodge pulled the gun and that Sumner relayed that information to Simonsen. Sumner and Simonsen contend that Sumner believed Gray's fiancé pulled the gun and relayed that information to Simonsen. The district **[*24]** court did not decide whose version of events is true. Instead, it concluded that Sumner and Simonsen were not entitled to qualified immunity "[u]nder either scenario." R.121 PID 1246-47. The district court, therefore, viewed Sumner's knowledge and what she told Simonsen as immaterial facts. *George v. Youngstown State Univ., 966 F.3d 446, 458 (6th Cir. 2020)* ("A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'" (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*)). We disagree with that legal determination. Sumner's understanding of the events and what she told Simonsen might be relevant to whether either or both committed a constitutional violation, *e.g.*, they engaged in active unconstitutional behavior. *Shehee, 199 F.3d at 300* ("knowing acquiescence").

In any event, what Sumner knew and told Simonsen are open factual questions not answered by the district court, and we are without jurisdiction to answer them in this interlocutory appeal of a denial of summary judgment based on qualified immunity. *Coffey, 933 F.3d at 583*-

To the extent Sumner and Simonsen contend that they still have qualified immunity under Gray's version of the facts, they are mistaken. *See Ouza v. City of Dearborn Heights, 969 F.3d 265, 277 (6th Cir. 2020)* ("[T]to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of **[*25]** the facts for purposes of the appeal." (quoting *Jefferson v. Lewis, 594 F.3d 454, 459 (6th Cir. 2010)*)). Gray's theory is that Sumner knew that Hodge pulled the pistol on Gray's fiancé, R.72-1 Ex. 2 at 5:26 - 7:55, and told Simonsen the same, R.72-2 PID 591-92. If true, Sumner and Simonsen both knew what Barnett knew: that there was no gunman on the loose and that Gray was simply a noncooperative victim or witness whom they lacked a constitutional basis to seize. R.72-1 Ex. 1 at 7:31 - 7:40 (Sumner responding, "that's true, that's true" when Barnett told her that Gray said "she didn't call [the police], she's not under arrest, and she has

2023 U.S. App. LEXIS 21581, *25

the right not to say anything"). And if they had knowledge of these facts, Simonsen (in directing Sumner) and Sumner (in directing Barnett) engaged in active unconstitutional behavior, in that they (at the very least) authorized, approved, or knowingly acquiesced in Barnett's unconstitutional seizure. *See, e.g., Bennett v. City of Eastpointe, 410 F.3d 810, 820-21 (6th Cir. 2005)* (summary judgment on *§ 1983* supervisory liability claim denied to chief of police who "instructed his officers to investigate any black[] youths riding through Eastpointe"); *Stillwagon v. City of Delaware, 747 F. App'x 361, 374-75 (6th Cir. 2018)* (summary judgment denied on *§ 1983* supervisory liability claim to detective sergeant who "ordered [an officer] to direct [another] **[*26]** to file the criminal complaint against" the plaintiff and "approved the steps they were taking to investigate the case"); *Keating v. City of Miami, 598 F.3d 753, 763-64 (11th Cir. 2010)* (supervisory liability under *§ 1983* plausibly alleged against police chief who "approved orders permitting the police [] to advance while beating unarmed demonstrators and discharging projectiles and tear gas," and against police captain who "directed the police

[] to begin discharging weapons at the unarmed demonstrators"). Because we earlier concluded that Barnett violated Gray's clearly established constitutional rights in seizing Gray, Gray has satisfied her burden to overcome Sumner and Simonsen's assertions of qualified immunity at this juncture.

V.

For these reasons, we **AFFIRM** the district court's denial of qualified immunity to Barnett, Sumner, and Simonsen with respect to Gray's unreasonable-seizure and false-arrest claims, and **REVERSE** the district court's denial of qualified immunity to Barnett with respect to Gray's excessive force claim.

**End of Document**